UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TERESA LYNN PETERSON,<br><br>Defendant. | 4:20-CR-40072-02-KES<br><br><br>ORDER DENYING MOTION FOR RELIEF UNDER THE<br>FIRST STEP ACT |

Defendant, Teresa Lynn Peterson, filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). Docket 176. Plaintiff, the United States of America, opposes the motion. Docket 191. For the following reasons, Peterson's motion for compassionate release is denied.

## BACKGROUND

On November 30, 2021, Peterson pleaded guilty to conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846. Dockets 89, 120. On February 28, 2022, the court sentenced Peterson to 120 months in custody followed by 5 years of supervised release. Docket 150; Docket 151 at 2-3. Her projected date of release is August 14, 2030. *See Find an Inmate.*, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Oct. 13, 2022).

Peterson is incarcerated at FMC Carswell, an administrative security federal medical center with an adjacent minimum security satellite camp. *See id.; FMC Carswell*, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/crw/ (last visited Oct. 13, 2022).

The total population at FMC Carswell is 1,137 persons. *See FMC Carswell.*

Peterson is 62 years old. *See Find an Inmate.* In support of her motion, Peterson cites her life expectancy, medical conditions, the current conditions in FMC Carswell, and the COVID-19 pandemic as circumstances that warrant release from custody under the First Step Act. Docket 176. On July 11, 2022, Peterson submitted an Inmate Request to Staff form to the warden of FMC Carswell requesting compassionate release due to extraordinary and compelling reasons. Docket 185 at 98. Peterson filed a pro se motion seeking compassionate release under the First Step Act on June 21, 2022. Docket 176. On July 19, 2022, the federal public defender's office filed a supplement in support of Peterson's motion for compassionate release. Docket 186.

## DISCUSSION

Because sentences are final judgments, a court ordinarily "may not modify a term of imprisonment once it has been imposed[.]" 18 U.S.C. § 3582(c). In 2018, Congress passed the First Step Act (FSA). Pub. L. No. 115-391, 132 Stat. 5194 (2018). In pertinent part, the FSA amends 18 U.S.C. § 3582(c)(1)(A) to permit incarcerated defendants in certain circumstances to file motions with the court seeking compassionate release. Compassionate release provides a narrow path for defendants with "extraordinary and compelling reasons" to leave prison early. 18 U.S.C. § 3582(c)(1)(A)(i). Such a reduction in sentence must take into consideration the 18 U.S.C. § 3553(a) sentencing factors and be consistent with applicable policy statements issued by the Sentencing

Commission. 18 U.S.C. § 3582(c)(1)(A).

The Sentencing Commission's policy statement, which was adopted before the FSA was passed, requires both "extraordinary and compelling reasons" to warrant a sentence reduction and that the defendant not pose a "danger to the safety of others." USSG § 1B1.13(1)-(2) (Nov. 2021). The burden to establish that a sentence reduction is warranted under 18 U.S.C. § 3582(c) rests with the defendant. *See United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

Peterson argues that the global COVID-19 pandemic, her severe health conditions along with her life expectancy, and the current conditions of FMC Carswell satisfy the "extraordinary and compelling reasons" standard under 18 U.S.C. § 3582(c)(1)(A)(i). Docket 176 at 1-2; Docket 186 at 2-4, 5-10; Docket 195 at 2-6. She asks for a sentence of time served and a period of home confinement as a condition of supervised release. Docket 186 at 12.

### I.   Administrative Exhaustion

Previously, only the BOP Director had the authority to bring a compassionate release motion on a defendant's behalf. With the enactment of the FSA, however, Congress has now permitted courts to grant compassionate release on motions filed by defendants "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is

3

earlier[.]" 18 U.S.C. § 3582(c)(1)(A).

Peterson submitted an Inmate Request to Staff form to the warden of FMC Carswell on July 11, 2022, asking for consideration under compassionate release due to extraordinary and compelling reasons. Docket 185 at 98. The record does not reflect a response from the warden, nor does it indicate whether Peterson's request was received. *See* Dockets 178, 183, 184, 185, 194. Nevertheless, because more than 30 days have lapsed since the submission of her request, and hearing no objection from the United States, the court will presume Peterson has satisfied the administrative exhaustion requirement and will review the matter on the merits.

## II.   Extraordinary and Compelling Reasons

The Sentencing Commission was directed by Congress to describe what "should be considered extraordinary and compelling reasons" for compassionate release and fashion "the criteria to be applied and a list of specific examples. " *See* 28 U.S.C. § 994(t). The Sentencing Commission affirms that rehabilitation alone does not constitute an extraordinary and compelling reason. *Id.* To provide some further guidance, the Sentencing Commission limited "extraordinary and compelling reasons" to three categories. USSG § 1B1.13, cmt. n.1(A)-(C). The three categories pertain to a defendant's (1) serious physical medical condition or cognitive impairment, terminal illness, deterioration of one's physical or mental health because of the aging process, (2) advanced age and deteriorating health in combination with the amount of time served, and (3) compelling family circumstances. *Id.* A fourth catch-all

category also exists for an "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the BOP. USSG § 1B1.13, cmt. n.1(D). The Sentencing Commission also asserts that the "foreseeability of extraordinary and compelling reasons" does not exclude one from consideration for a reduction in sentence. USSG § 1B1.13, cmt. n.2.

The court has detailed the governing law and the analysis it uses when confronted with a compassionate release motion in many previous orders. *E.g.*, *United States v. Kenefick*, 5:19-CR-50058-01-KES, 2022 WL 1295898, at *2-3 (D.S.D. Apr. 13, 2022); *United States v. Beall*, 4:15-CR-40080-01-KES, 2022 WL 1202602, at *2-3 (D.S.D. Apr. 22, 2022); *United States v. Shields*, 3:07-CR-30106-01-KES, 2021 WL 765001, at *2-3 (D.S.D. Feb. 26, 2021); *United States v. Muhs*, 4:19-CR-40023-02-KES, 2021 WL 534517, at *2-3 (D.S.D. Feb. 12, 2021). The court has assumed the policy statements still apply to compassionate release motions brought under the FSA and utilizes USSG §1B.13, Notes 1(A)-(D) to guide its analysis. *See, e.g.*, *Muhs*, 2021 WL 534517, at *3.

Peterson contends that the COVID-19 pandemic, her health conditions and life expectancy, coupled with the current conditions of FMC Carswell satisfy the "extraordinary and compelling reasons" standard under 18 U.S.C. § 3582(c)(1)(A)(i). Docket 176 at 1-2; Docket 186 at 2-4, 5-10; Docket 195 at 2-6.  The court will analyze her circumstances under the medical conditions category, USSG § 1B1.13 Note 1(A) and the catch-all provision, USSG § 1B1.13

5

Note 1(D).

Assuming the court's discretion to consider compassionate release is at least as broad as the outdated policy statement of the Sentencing Commission, Peterson has failed to show that her reasons for release rise to the level of "extraordinary and compelling" circumstances justifying a reduction in sentence.

### A.    Medical Conditions Category, Note 1(A)

As relevant here, the medical conditions category applies when the defendant is suffering from a serious physical or medical condition that substantially diminishes her ability to provide self-care within a correctional facility and from which she is not expected to recover. USSG § 1B1.13 cmt. n.1(A)(i)(ii).

COVID-19 appears to pose a particular risk for individuals with certain existing health conditions. The Centers for Disease Control and Prevention (CDC) updated its current understanding of these risks. *See People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (Sept. 2, 2022) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. The CDC states individuals with the following conditions are more likely to become very sick with COVID-19: cancer or having a history of cancer, chronic kidney disease, chronic liver disease (such as alcohol-related liver disease, non-alcoholic fatty liver disease, autoimmune hepatitis, and cirrhosis), chronic lung diseases (including moderate to severe asthma, bronchiectasis, bronchopulmonary dysplasia,

chronic obstructive pulmonary disease, emphysema, chronic bronchitis, interstitial lung disease, idiopathy pulmonary fibrosis, pulmonary embolism, and pulmonary hypertension), cystic fibrosis, dementia or other neurological conditions, diabetes (type 1 or type 2), having any type of disability (such as ADHD, cerebral palsy, birth defects, intellectual and developmental disabilities, learning disabilities, spinal cord injuries, or Down syndrome), heart conditions (such as heart failure, coronary artery disease, cardiomyopathies, or possibly hypertension), HIV infection, immunocompromised condition or weakened immune system due to a medical condition or treatment for a condition (such as people who have cancer and are on chemotherapy, a solid organ transplant, taking certain types of medicines for long periods of time, and having a life-long condition), mental health conditions (having mood disorders, including depression, and schizophrenia spectrum disorders), being overweight or obese, partaking in little or no physical activity, pregnancy, sickle cell disease or thalassemia, being a current or former smoker, having a solid organ or blood stem cell transplant, stroke or cerebrovascular disease, substance use disorders (such as alcohol, opioid, or cocaine use disorder), and tuberculosis. *Id.*

  The court has reviewed the medical records in this case. Peterson is diagnosed with sleep apnea, heart disease, emphysema, severe COPD, asthma, and gastro-esophageal reflex disease without esophagitis. Docket 178 at 98-99; Docket 183 at 14; Docket 184 at 98-99; Docket 185 at 1. Peterson is currently prescribed an aero chamber, albuterol inhaler, tiotropium,

fluticasone/salmeterol for her COPD, aspirin and atorvastatin for her heart disease, and omeprazole for her gastro-esophageal reflux disease. Docket 178 at 109-110; Docket 183 at 6-7, 18-19; Docket 184 at 17-18, 48. She is on portable oxygen for her sleep apnea. Docket 184 at 66, 91.

Peterson has been battling COPD for over a decade. Docket 149 ¶ 103. She is a former smoker, was diagnosed with COPD in 2006, and is currently in stage 4 COPD. *Id.*; Docket 178 at 46. Peterson was seen for complaints of a cough on various instances in the past. Docket 178 at 218-219, 221. After a chest x-ray showed chronic right middle lobe opacities, a chest CT was ordered that indicated right lung densities. *Id.* at 221-222. These densities reflected a partial collapse and the doctors note such densities have been chronic on Peterson's past chest films. *Id.* at 223. Her doctors recommended a pulmonology consult that was completed on March 6, 2017. *Id.* at 224. The pulmonary study reaffirmed that Peterson's severe obstructive lung disease was "moderately severe[.]" *Id.*

On August 4, 2020, Peterson was seen for cough and shortness of breath. Docket 178 at 329. The records reflect her COPD was being managed on Advair and PRN Ventolin; however, Peterson had run out of her medication three months prior, which aligns with the onset of her symptoms. *Id.* She received a prescription refill and was scheduled for a cancer screening. *Id.* at 238-239. The screening showed moderate coronary artery calcification and emphysema. *Id.* at 238. The provider recommended a follow up in 12 months. *Id.* at 239. Two weeks after her appointment, Peterson was seen again for

complaints of shortness of breath. *Id.* at 332. Her doctor believed she was undergoing an acute chronic COPD exacerbation and she was prescribed a short course of steroids as well as a Spiriva inhaler. *Id.* at 333.

Peterson suffered from multiple exacerbations thereafter. *Id.* at 334-335, 337-338. While on home confinement, Peterson had an exacerbation in December in 2021 and was hospitalized. *Id.* at 286, 346, 348; Docket 185 at 23. She tested positive for Influenza A and was treated with prednisone, doxycycline, Tamiflu, and DuoNeb's, which alleviated her symptoms. Docket 185 at 34. Additionally, she received respiratory therapy during her hospitalization and was placed on three liters of oxygen. *Id.* Peterson was discharged when she was no longer tachycardic and her vitals were stable. *Id.* At a follow-up appointment with her pulmonologist, he recommended she "highly consider" pulmonary rehabilitation. Docket 178 at 286. Additionally, Peterson was advised that her survival rate for the next four years was 18 percent.[1] *Id.* at 287; Docket 185 at 47.

In May of 2022, Peterson was hospitalized for yet another exacerbation while incarcerated. Docket 178 at 12, 17, 20. She was treated for acute

---

[1] Peterson's pulmonologist utilized the BODE Index to calculate her rate of survival. The BODE takes into consideration the patient's body mass, lung obstruction, dyspnea, and exercise capacity. *See* Melissa H. Roberts et al., *Development of a Modified BODE Index as a Mortality Risk Measure Among Older Adults with and Without Chronic Obstructive Pulmonary Disease*, 178 Am. J. Epidemiology 1150 (2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3857925/. The pulmonologist utilized values that were collected during different appointments ranging from March of 2017 to the time of her appointment. Docket 178 at 287.

exacerbation of COPD with superimposed pneumonia. *Id.* at 17. She received antibiotic therapy and received scheduled steroids, nebulizers, and inhalers as needed. *Id.* After being discharged, Peterson continued to have a productive cough, dyspnea, and shortness of breath. *Id.* at 7. At a follow up appointment, Peterson received prednisone, a solution to be used with her nebulizer, and amoxicillin. *Id.* at 8-7. Peterson reported feeling much better since her last visit on June 3. 2022. *Id.* at 2.

Peterson's most recent exacerbation occurred on July 27, 2022. Docket 194 at 39. Peterson had been suffering from chest pain for three days before coming into the Emergency Room. *Id.* According to her discharge summary, she was diagnosed with pneumonia and was prescribed amoxicillin-clavulanate and azithromycin to treat a bacterial lung infection. *Id.* at 39-40, 66. Her doctors conducted a dobutamine stress echocardiogram that resulted in a negative result for ischemia but presented a septal myocardial infarction.[2] *Id.* at 70, 75. Her results also displayed normal values for resting ejection fraction,[3] normal global left ventricular systolic function, and no wall motion

---

[2] A septal myocardial infarction is typically the byproduct of a heart attack. *See Septal Infarct*, Healthline, https://www.healthline.com/health/septal-infarct (last visited Sept. 28, 2022). During a heart attack, septal infarcts can form resulting in decaying tissue on the septum. *Id.* The septum separates the right and left ventricle of the heart. *Id.* Some symptoms include chest pain and shortness of breath. *Id.*

[3] A normal ejection fraction falls within 50% to 75%. *See Ejection Infraction: What Does It Measure?* , Mayo Clinic, https://www.mayoclinic.org/tests-procedures/ekg/expert-answers/ejection-fraction/faq-20058286#:~:text=The%20left%20ventricle%20is%20the,between%2041%25%20and%2050%25 (last visited Sept. 28, 2022).

abnormalities were noted at baseline. *Id.* at 75. Her chest X-Ray showed hyperinflation of the lungs and a "[q]uestionable right middle lobe infiltrate with silhouetting of the right heart border." *Id.* at 78. Peterson was discharged back to FMC Carswell on July 28, 2022. *Id.* at 2. She was seen on August 3, 2022 and was instructed to continue her current medications and to follow up with her medical provider if her symptoms of pneumonia did not improve. *Id.* at 1.

The record clearly reflects that Peterson has a moderate to severe case of COPD. Dockets 178, 183-185. Peterson argues that her condition is worsening despite being at the highest level of care at a medical facility while being incarcerated. Docket 186 at 3, 6-7. She also asserts her limited life expectancy as further support for compassionate release. *Id.* at 6.

Peterson's life expectancy was calculated using the BODE index to determine her rate of survival over the next four years. Docket 185 at 46-47. The life expectancy was calculated in December of 2021. *Id.* Peterson had scored 7 points, resulting in a survival rate of 18% over the next four years, but it is important to note that some values utilized in this survival rate calculation were the same as in 2017. *Id.* On March 6, 2017, her PFTs showed (1) 43% for FEV1 1.14L resulting in two points under the index, (2) a walk test with a distance achieved of less than 149 m on March 6, 2017 indicates three points, (3) the results of the walk test produced two points under the dyspnea scale of the BODE index, and (4) Peterson had a BMI of 16.6 resulting in an additional point under the index for a total of seven points. Docket 178 at 307; Docket

185 at 16, 46-47; *See* Roberts, *supra*. Peterson had the identical survival rate and life expectancy in 2017 as she did in 2021, which demonstrates that Peterson's COPD has maintained a constant state and has not deteriorated as alleged. *See id.*

Finally, the court turns to Peterson's claim that she cannot provide self-care while incarcerated due to her hospitalizations and suffering from shortness of breath, chest pain, and malaise. Docket 195 at 4. The hospitalizations listed in her medical records were short in length and the records do not indicate long term hospitalization care. Docket 178 at 17, 50, 350. Additionally, most of these symptoms align with the general onset symptoms of COPD and "[w]ith proper management, most people with COPD can achieve good symptom control and quality of life[.]" *See* COPD, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/copd/symptoms-causes/syc-20353679 (last visited Sept. 29, 2022). The court is confident in FMC Carswell's ability to provide quality medical care when treating Peterson. As Peterson stated, FMC Carswell is a medical facility designed to provide the highest level of care. Docket 186 at 3. Peterson is receiving treatment for her COPD in addition to her other medical conditions-- sleep apnea, heart disease, emphysema, asthma, and gastro-esophageal reflex. Docket 178 at 109-110; Docket 183 at 6-7, 18-19; Docket 184 at 17-18, 48. Peterson's records indicate that her medical conditions are controlled with medication, which demonstrates that her conditions can be managed while she is housed in a correctional facility. Docket 178 at 2, 53. In sum, the court concludes that

Peterson's health conditions—COPD, sleep apnea, heart disease, emphysema, asthma, and gastro-esophageal reflex disease without esophagitis—do not amount to extraordinary and compelling circumstances justifying a reduction in sentence.

Moreover, the COVID-19 pandemic alone is insufficient to warrant early release. The BOP has made significant changes to correctional operations since the pandemic started in early 2020. *See COVID-19 Coronavirus*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Oct. 13, 2022). These include sanitary and safety measures, restrictions on movement, and visitation restrictions, amongst others. *Id.* The BOP has also transferred many thousands of inmates to home confinement. *See id.* Since March 26, 2020, 48,417 inmates have been placed in home confinement. *Id.* These measures have led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources.

The court believes Peterson's medical conditions are appropriately managed at FMC Carswell, the facility is engaged in appropriate efforts to protect inmates against the spread of COVID-19, and the facility would act to treat any inmate who does contract COVID-19. The fact that FMC Carswell had a COVID-19 outbreak does not negate such conclusions. The data for FMC Carswell shows a COVID-19 outbreak that was ultimately contained. *See COVID-19 Coronavirus*. There were 8 deaths, as a result, and 702 inmates have recovered. *Id.* This persuades the court that FMC Carswell has acted appropriately to treat inmates who do contract COVID-19. The court believes

the facility will continue to appropriately treat inmates who do so.

The BOP's vaccination program for staff and inmates is another protective measure warranting consideration in this stage of the COVID-19 pandemic. The BOP has implemented a COVID-19 vaccination plan to protect inmates and staff and limit the transmission of COVID-19 within the facilities. *See id.* As of October 13, 2022, 331,270 doses have been administered systemwide. *Id.* At Carswell FMC, 1,630 inmates were fully inoculated as of October 13, 2022. *Id.* Peterson received her first dose of the COVID-19 Pfizer vaccine on August 28, 2021 and her second dose on September 18, 2021. Docket 185 at 97. Peterson received a third dose on February 24, 2022. *Id.* Recently, Peterson refused a fourth COVID-19 vaccine on April 1, 2022. Docket 178 at 105. This leads the court to conclude Peterson is not overly concerned about a risk of infection.

Moreover, the BOP's efforts to limit the spread of COVID-19 and protect inmates appear to be working. As of October 13, 2022, the BOP reported only 187 federal inmates have confirmed positive test results for COVID-19 nationwide. *See COVID-19 Coronavirus.* There are currently over 143,000 federal inmates in BOP-managed facilities. *Id.*

In light of the above, the court finds Peterson's circumstances do not clear the high bar necessary to warrant compassionate release for "extraordinary and compelling reasons" under 18 U.S.C. § 3582(c)(1)(A)(i).

### B. Catch-all Category, Note 1(D)

The catch-all category in Note 1(D) does not result in a different outcome.

The catch-all category allows for release if there are extraordinary and compelling reasons other than, or in combination with, those identified in 1(A) through 1(C) USSG § 1B1.13, cmt. n.1(D). Even after considering Peterson's health conditions and the COVID-19 pandemic, the court is not convinced that "extraordinary and compelling reasons" exist to release her from custody early.

### III. Sentencing Factors of § 3553(a)

The 3553(a) sentencing factors further show that compassionate release is not warranted. Peterson pleaded guilty to conspiracy to distribute a controlled substance. Docket 120. In early March of 2020, Peterson was involved in a traffic stop that produced two bundles wrapped in cellophane containing 2,602.6 grams of methamphetamine. Docket 149 ¶ 19. Following a search of Peterson's home, law enforcement discovered an additional 498.3 grams of methamphetamine, bulk packaging materials, and a digital scale. *Id.* A co-conspirator informed law enforcement that Peterson and the co-conspirator would purchase methamphetamine from each other on various occasions. *Id.* ¶ 29. The co-conspirator introduced Peterson to another co-conspirator for that same purpose. *Id.* The co-conspirator, who was introduced to Peterson, had her store his bulk supply of methamphetamine in exchange for the co-conspirator fronting Peterson methamphetamine at $10,000 per kilogram for a total of 10 kilograms at $100,000. *Id.* ¶ 45. Peterson had also purchased 1-ounce quantities of methamphetamine (from a different supplier) approximately twice a week for two months in order to support her habit. *Id.* ¶ 48. At a minimum, Peterson was responsible for 4.5

kilograms of methamphetamine (actual). *Id.* ¶ 63.

The total offense level was calculated as 29 and Peterson was in criminal history category IV. *Id.* ¶¶ 77, 91. Peterson's guideline range was 121 to 151 months and faced a mandatory minimum sentence of 10 years in custody. *Id.* ¶¶ 122-123. At sentencing, the court granted the motion for downward variance and sentenced Peterson to the mandatory minimum of 120 months. Docket 180 at 12-14. Although the court was statutorily bound when imposing its sentence, the absence of the mandatory minimum would not have led to a different outcome. The sentence imposed took into account Peterson's medical conditions, her role in the conspiracy, and her background among other factors. The court recognizes that the foreseeability of any extraordinary and compelling reason does not preclude consideration for a reduction in sentence under USSG § 1B1.13 cmt. n.1(2). The court's reassessment, however, arrives at the same conclusion: the sentence of 120 months that was recently imposed by this court on February 28, 2022, continues to be appropriate for the seriousness of the crime to which Peterson pleaded guilty.

### III. Motion for Appointment of Counsel

Peterson moves for appointment of counsel to assist with her motion for compassionate release. Docket 176 at 2. On July 27, 2022, the Federal Public Defender filed a notice of categorization of compassionate release classifying Peterson's motion as high priority. Docket 177. Under Standing Order 20-06A, the federal public defender is appointed to represent all defendants who may be

eligible for compassionate release, therefore the Federal Public Defender, through Molly Quinn, is considered counsel of record. *See* Standing Order 20-06A. Because Peterson has appointed counsel under Standing Order 20-06A, the motion is denied as moot.

## CONCLUSION

Peterson has failed to satisfy the extraordinary and compelling reason standard. Thus, it is

ORDERED that the defendant's motion for relief under the First Step Act (Docket 176) is denied.

IT IS FURTHER ORDERED that the motion for appointment of counsel (Docket 176) is denied as moot.

Dated October 14, 2022.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE